**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 25-CV-3943 |
| APPROXIMATELY 13.98 MILLION USDT, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant in rem, | ) | |
| | ) | |
| HAN KIM, | ) | |
| | ) | |
| Claimant | ) | |
| | ) | |

**VERIFIED CLAIM OF HAN KIM**

**Introduction**

1.    In 2000, Reverend Dong Shik Kim, who had moved to China from the U.S. seven years earlier to minister to refugees and people with disabilities, was kidnapped by an agent of the Democratic People's Republic of Korea ("North Korea") and taken into North Korea, where he was tortured and murdered by the state. In 2015, the Reverend's brother, Yong Seok Kim, and the Reverend's son, Han Kim, won a $330,000,000 money judgment against North Korea—$15,000,000 each in compensatory damages, and $300,000,000 in punitive damages. *Kim v. Democratic People's Republic of Korea ["DPRK"]*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015). North Korea has yet to pay a cent towards the judgment.

2.    On November 20, 2025, the Kims registered their judgment in the Southern District of New York and, on December 10, 2025, they served writs of execution issued by that court on the U.S. Marshal directed to Tether International *S.A. de C.V.*, a Salvadoran company that issues a crypto asset called Tether (abbreviated USDT), which is meant to maintain a stable value of one dollar. *Kim v. DPRK*, 25-MC-527 (S.D.N.Y.). The writs were directed to "all . . . property interests of any kind of the Democratic People's Republic of Korea or its agencies or instrumentalities, including but not limited to Tether Coins ('USDT'), digital wallet balances, any interest in Tether International S.A. de C.V., or its affiliates' cash, securities, or bonds, or other obligations and any other assets or interests held by, or for the benefit of, the Democratic People's Republic of Korea and its instrumentalities and agents." Under New York law, service of the writ gave the Kims a lien on all North Korean property that Tether is capable of turning over. *Don King Prods., Inc.*

1

*v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) ("Under New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the sheriff"); *All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 21 (2d Cir. 1999) (explaining concept of "property" in the custody of a garnishee for purposes of New York law).

3.      USDT maintains a stable value because Tether promises USDT holders that "[e]ach Tether Token in circulation is 100% backed by an amount of assets ('Reserves') equal to the stated value of the Tether Token." Tether holds those reserves at Cantor Fitzgerald, in New York City, and, therefore, under Second Circuit law, is subject to personal jurisdiction in New York for execution actions against assets, like USDT, that represent interests in those reserves. *See, e.g.*, *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024). The Kims notified Tether of their SDNY collection action the day they served the writ of execution and immediately began meeting and conferring with Tether's counsel regarding service and potential areas of agreement for a forthcoming motion for turnover of North Korea's interests, which are made subject to execution under the Foreign Sovereign Immunities Act (FSIA) and Terrorism Risk Insurance Act (TRIA).

4.      Two days after the Kims served their writ on the Marshal, the United States published notice in this action seeking to forfeit North Korea's ownership of approximately 13.98 million USDT that the United States alleges North Korea obtained by selling other crypto assets North Korea had stolen from Claimant Huobi Global *S.A.*, a Panamanian crypto exchange. ECF No. 1, Complaint ¶¶ 13, 31–34;

2

ECF No. 7, Verified Claim of Huobi Global, *S.A.* ¶ 2. The United States alleges that the Defendant USDT are the proceeds of wire fraud, wire fraud conspiracy, money laundering, money laundering conspiracy, computer fraud and computer fraud conspiracy," and that "Tether burned the USDT associated with the Target Addresses and reissued an equivalent amount of the USDT to the U.S. government." "That reissued USDT," the United States alleges, "is the Defendant property." Compl. ¶ 13.

5.      Han Kim files this Verified Claim, pursuant to 18 U.S.C. § 983(a)(4)(A) and Rule G(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, to assert his superior right to the Defendant USDT. The Kims' right—that is, the right asserted in this Claim and the one by co-claimant Yong Seok Kim (collectively, "the Kims")—is superior to the United States's for two reasons. First, under New York law (which is incorporated in federal court by Federal Rule of Civil Procedure 69(a)), when the Kims served the U.S. Marshal, they created a lien that, under *Estate of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 638 (D.C. Cir. 2025), survives the government's seizure because that property is within the United States and owned by a terrorist party, and so it constitutes the "the blocked assets of that terrorist party" and "shall be subject to execution" of the Kims' "judgment against that terrorist party . . . notwithstanding any other provision of law," *id.* Second, TRIA itself confers on the Kims specific rights in defined assets of North Korea, namely its "blocked assets," and so the Kims have at least a colorable interest in that property sufficient to sustain this Claim.

### Parties

6.      The United States is the Plaintiff in this Action.

7.    The Defendant Property is a USDT balance of 13,980,951.10343 currently held in a Tron blockchain wallet address that the United States describes as rendering the property "in the possession of the USMS [U.S. Marshal Service]." The Complaint does not reveal whether the USMS has the private key to the wallet address, if the USMS does have the key to that wallet address where the person with that key is located, or whether the USMS maintains what it describes as possession of the assets through a contractor or service provider who maintains actual custody.

8.    The balance of the Tron blockchain wallet that the United States describes as in its possession (which this Claim will describe as belonging to the United States for convenience without conceding whether the United States has possession, custody, or control of the assets) came to that wallet address by a warrant issued at 25-sz-33, which authorized the United States to request or compel Tether to make the USDT balances of 47 wallet addresses (the "Target Addresses") to which North Korea or its agencies or instrumentalities has the private keys to zero and to cause the USDT balance of the United States's wallet to equal the sum of the USDT balances of the Target Addresses. The Target Addresses are:

a. TLq5jP2J2ebYghCX1mXP9gcFRfjPbcrfZs,

b. TRkJ39s58grMSMqFN8YgToMxcaj95ENFxf,

c. TDqroZaFsjWXhefyMqXthS2rvxzmWnavNZ,

d. TBo6abebYprVVWABcXbpbgtgGRtmeRSrdz,

e. TU4oX4BcjgfjQUFuKAC27rKzYvqS5hNyKH,

f. TDzh3ss71yCVCdKqcuQjvgaguVkJtmWSFh,

4

g. TEcpUeeiVqxmUujg2s5SAtFxkdN6P9bVB1,

h. TSSs4zyjdQM6L7a6v1umWmng3zzwzquSq8,

i. TEZuPBkVcNyci5WM3zrzoqX6ho4hMXgnJ6,

j. TNBWvFHbBDjd2JzPqwSPywh8rv1C4LXjdM,

k. TQPQT3im4NW6MGZSQwJBXA2S6Yj2saSBSy,

l. THSBNYfGL9ja7b5xU98f8ofU2iy2gXPjSN,

m. TTi46bHBvmkgc8NcHLfLB2587XF7GfZFQs,

n. TK6vKMXpG6Fsrt462Nahgzg8RuzLfemnRX,

o. TZ8Rni5ixMx6SKVFY4Qz7QdZYnbtRuGCVR,

p. TXwggJm8GMcbew9J6A5myt8Gi5dxM9j8ia,

q. TQ48GtajcAVJmohSBvJ4rvC9oVNZuWz57q,

r. TC6WxrikcxBQVN2vpChGwbJP9QEAPp7CoR,

s. TNSn4yJoR96ZruiEWPUFLxLa1k73bVpkEh,

t. TByiFBGTx83ptNhLiFcQJQxtnG66hs4GY3,

u. TKvUXiHow912c8HPCpwrrdoz4z47NWwL9D,

v. TDmBm5zUSiupoV71MXUittZqReN3h85nJc,

w. TN7iF7MgBSBNYFr38b3jYiCUEbREJAiWjz,

x. TG9ZAev1Q4335uM6Gwm5df9eFUFz8e6Xgo,

y. TMYtjT2aGUtY16WKF1bkh4ssjoKFKiznqw,

z. TLv2pzHZaHyY8k5nWfCE6cGGkLwdQCi3Dg,

aa. TLDwBfJBRptX5nFh4rCbvhkhT5cGWbHfKR,

bb. TWYCvyCmhikaVpKx6Zf3nGWUjYbVhSGQK5,

5

cc. TRxz3DY9ELAoFSZyf4CuaLyEHhGYmQ8b2w,

dd. TTPjk6tJjHPWNxLwEGE4ZW8ADqGsd95zvc,

ee. TA9bzquWzBRKgjTPJ5gbWMWv86rYqc2yZj,

ff. TDh6QVjBaYF5kdN2qrREKydArESsG12N9h,

gg. TMunHrvu7UCM8Ro6c968SPwRx9EdLDnHW5,

hh. TPjsHN4KRdaWYvUbVdMUuAeL6k7qLpTTxW,

ii. TAZ6yaCrxvyVED6634GKXPntR7v6aBn7Rb,

jj. TLVSDypgdtRTd1yuGNquCLMoDhgkVrCgmo,

kk. THhic3agJ4544GuJUhuEj7bisxriYfkjb8,

ll. TTbgnFEFEmicu1eXN3bvuE8fKbdx3di8Yb,

mm. TLivG1x3R7Wgjha1w7Xgz2XWcWRV82yK8c,

nn. TW6swH66FMUMgjxHHSUUy1qDKrXZxprAKV,

oo. TXKPga6EH25mexfQ7BMFGbVfGwz1rvqXVK,

pp. TDskBcHHaFYSJz3QuKBSd5Q9ZxEc8dPzyH,

qq. TXJeZYLn2Vr7DUwvrqceo5VRQ8b9EucxLn,

rr. TWr1G47DtfvPZ1QAH3RgV9c6SkSSe8a9hS,

ss. TKdBozGxEFNZoAwX3rYB9gsZ373jQAYgkm,

tt. TCxCHCndDkz2xNAaYibienjLaS8eZASaXu, and

uu. TVFhKSygmJA1Qu7hrC4eavg8Esp9AoH2pu.

9.      Co-Claimant Yong Seok Kim is the brother of the late Reverend Dong Shik Kim. Claimant Han Kim is the son of Reverend Kim. They are judgment

6

creditors against North Korea and hold a superior property interest in North Korea's interests with Tether.

## Jurisdiction and Venue

10.    This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

11.    The United States invokes venue under 18 U.S.C. § 3238, which addresses criminal cases. This is not a criminal forfeiture case. The United States's Complaint does not reveal where the person with possession, custody, or control of the USDT is located. Claimants do not concede that venue is appropriate in this Court and reserve the right to challenge venue or move to transfer at the appropriate time.

## The Tron Blockchain

12.    A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it to all prior series of transactions (hence "chain") in a way that is verifiable and practically immutable.

13.    The blockchain at issue in this case is called Tron. Users participate in Tron using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. Each time Tron validates a new block, it updates the state of its ledger to reflect information about each wallet address on the blockchain.

7

14.    Tron can record transactions in many different assets using a protocol "TRC-20 standard." This standard enables anyone on the Tron blockchain to create a "token" using something called a "smart contract."

15.    A TRC-20 token is represented by a number representing a token balance associated with a wallet address that holds that balance.

16.    All standard tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. But some TRC-20 tokens have additional functions encoded by their creators, including, for example, the ability for the creator to freeze the token balance of specific wallets so that they will always remain the same; to decrease the token balances of wallets; and to increase the token balances of wallets.

### USDT and Tether's Business

17.    Tether International *S.A de C.V.* is Salvadoran company that issues USDT, the world's largest stablecoin by volume. Tether's business is straightforward: It issues USDT in exchange for dollars and redeems USDT on demand for dollars, always on a one-to-one basis. (Tether also issues stablecoins backed by other currencies, like the Euro and Mexican Peso; these coins are not at issue in this Claim.)

18.    Tether's Terms of Service provide that each USDT is backed by "cash, cash equivalents and other assets and may include loan receivables and other assets from [Tether] Affiliates." Because Tether holds reserves for all USDT holders and gives them the right to redeem USDT for those reserves if they meet certain conditions, *id.*, USDT are called "stablecoins": ideally the value of 1 USDT token is always one U.S. dollar.

8

19.     To issue USDT, Tether uses its private keys to direct the smart contract code that it controls to cause a wallet address's USDT balance to equal the amount of USDT purchased. Then, anyone with the private keys to *that* wallet address can transfer the USDT to any other wallet address.

20.     Tether always retains the power to cause the USDT balance of any wallet address to decrease to zero.

21.     At any time, then, the people who possess *two* private keys can cause the USDT balance of a wallet address to decrease while simultaneously causing the USDT balance of another wallet address to increase—the person who holds the private keys to the decreasing (or sending) wallet address, and the person who holds the private keys to Tether's smart contract code (which only Tether does).

22.     No person other than the person with the private keys to Tether's smart-contract code (which no person other than Tether has) can cause the USDT balance of any wallet address to *increase* without a corresponding identical decrease in that person's own wallet address.

23.     To ensure the coins maintain their value and that Tether can meet its redemption obligations, Tether holds reserve assets to support USDT holders' right of redemption. Cantor Fitzgerald, which is headquartered in New York City, serves as a custodian for and manages more than 99% of Tether's treasury assets. There are approximately $186 *billion* tether outstanding today.

9

**The Kims' Efforts to Recover Compensation For the Kidnapping, Torture, and Murder of Their Loved One**

24.    In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. DPRK*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013).

25.    In 2000, Reverend Kim was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. DRPK,* 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* He is presumed dead. *Id.*

26.    Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos. Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51.

27.    In 2009, the Kim family sued North Korea for the abduction and murder of Reverend Kim. *Kim v. DPRK*, No. 09-CV-648, Dkt. 1 (D.D.C. April 8, 2009).

28.    North Korea, after being properly served, did not appear to defend. *Id.* Dkt. No. 12 (entry of default). And so the Kims sought a default judgment. *Id.* Dkt. No. 46. The district court denied that request, reasoning that Kims had not presented evidence sufficient to meet the Foreign Sovereign Immunity Act's special provision for proof when a defendant defaults. *Kim*, 950 F. Supp. 2d at 34.

10

29.    The Kims appealed and the D.C. Circuit reversed, holding that "[t]he Kims . . . make a compelling case that North Korea" tortured Reverend Kim and murdered him outside of the normal legal process. 774 F.3d at 1050.

30.    On remand, the district court entered a default money judgment of $15,000,000 in compensatory damages for each of the Kims and $300,000,000 in punitive damages to be divided between them. *Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015).

31.    The Kims served the default judgment on North Korea, and on July 23, 2019, the court granted the Kims permission to enforce the judgment under 28 U.S.C. § 1610(c).

32.    Since judgment issued, Claimant's compensatory damage award has accrued $411,796.10 of interest on pursuant to 28 U.S.C. § 1961.

33.    In 2025, the Kims registered the judgment in the United States District Court for the Southern District of New York, *Kim v. DPRK*, No. 25-MC-527 (S.D.N.Y. 2025).

### North Korea Steals Crypto Assets, Launders Them and Comingles Them With Assets From Other Sources, Then Sells Them For USDT

34.    North Korea does not maintain diplomatic or economic relations with much of the world but nonetheless maintains a very expensive nuclear-weapons program.

35.    To fund this program, as well as basic services, North Korea has turned to a widespread and extremely aggressive campaign of cyber-attacks. *See* MULTILATERAL SANCTIONS MONITORING TEAM, THE DPRK'S VIOLATION AND EVASION

11

OF U.S. THROUGH CYBER AND INFORMATION TECHNOLOGY WORKER ACTIVITIES 11 (2025).

36.    These efforts include hacks of crypto exchanges, *id.* at 7; ransomware attacks on hospitals to extort money, *id.* at 11; and hacks of American companies, *id.* at 15.

37.    On November 22, 2023, North Korean agents wrongfully acquired assets worth approximately $107 million at the time from Huobi.

38.    North Korean agents then swiftly traded some of those tokens for the native asset of the Ethereum blockchain, called ETH, ultimately consolidating 47,194 ETH in newly created Ethereum wallet addresses. (For relevant purposes, Ethereum and Tron function identically.)

39.    The 47,194 ETH remained in those newly created wallet addresses until March 13, 2024, when North Korean agents sent them to a service called Tornado Cash, which is a service called a "crypto mixer" that obscures the origins of crypto transactions by blending assets with other users' assets. (For more details on Tornado Cash, see *Van Loon v. U.S. Dep't of the Treasury*, 122 F.4th 549, 557–58 (5th Cir. 2024).)

40.    According to the Complaint, "when those funds were withdrawn from Tornado Cash and then commingled with other funds known to have been stolen by the APT38 actors, it became clear that the funds were likely still in the hands of the actors and/or their money laundering co-conspirators." Compl. ¶ 42.

41.    North Korean agents then took the ETH from Tornado Cash and exchanged it, via a service called ThorSwap, for Bitcoin at the then-prevailing market price for that exchange.

42.    Over the next few days, North Korean agents made a dizzying series of Bitcoin transactions between wallet addresses that they controlled. North Korean agents did this for the purpose of obscuring their ownership of the Bitcoin.

43.    In or around April of 2024, North Korean agents sent some of the Bitcoin to a service called Bitget, which maintains accounts for its users and holds Bitcoin on their behalf.

44.    North Korean agents then sold some of the Bitcoin for USDT using a service called Binance Smart Chain.

45.    Eventually, the USDT balances that North Korea received in exchange for its Bitcoin ended up (after many other exchanges and obscuring transactions, *see* Compl. ¶¶ 58–71) in the Target Addresses.

46.    Based on a tip from Binance, the FBI requested that Tether voluntarily freeze the USDT balances of the Target Addresses.

47.    Tether froze the USDT balances of the target addresses over the course of several transactions in 2024.

48.    On or about March 19, 2025, the FBI provided Tether with a copy of seizure warrant 25-sz-33. That warrant is not publicly available to Claimant's knowledge.

49.     On or around March 19, 2025, Tether caused the USDT balance of the target wallet addresses to equal zero and the USDT balance of a wallet address belonging to the United States to equal the USDT balances that the target wallet addresses had before Tether decreased them to zero.

50.     The United States describes the March 19, 2025, transaction as "Tether then transferred to the United States the equivalent amount of USDT as was associated with the Target Addresses."

51.     Nothing about the March 19, 2025, transaction purported to, or did, extinguish any party's ownership interest in the Defendant Property.

**The Kims Establish Priority Over North Korea's Interests With Tether**

52.     On December 10, 2025, the Clerk of the United States District Court for the Southern District of New York issued writs of execution in *Kim v. DPRK*, 25-CV-527.

53.     That day, the Kims, through counsel, personally served those writs on the United States Marshal for the Southern District of New York.

54.     One of the Kim's writs was directed to Circle Internet Financial LLC, a company that issues another stablecoin, called U.S. Dollar Coin, that North Korea held.

55.     The other writ was directed to Tether.

56.     That writ "respectfully request[ed] that [the Marshal] execute this judgment by garnishing DPRK's assets, funds, or interests in the possession of Tether International, *S.A. de C.V.*, located at Edicio Torre Futura, Ocina 6, Nivel 11, Entre

14

87 y 89 Avenida Norte, Colonia Escalón, San Salvador, El Salvador." The writ specifically requested that the Marshal

> [L]evy or seize all assets, funds, and property interests of any kind of the Democratic People's Republic of Korea or its agencies or instrumentalities, including but not limited to Tether Coins ("USDT"), digital wallet balances, any interest in Tether International S.A. de C.V., or its affiliates' cash, securities, or bonds, or other obligations and any other assets or interests held by, or for the benefit of, the Democratic People's Republic of Korea and its instrumentalities and agents.

57. On December 12, 2025, the Kims, through counsel, emailed a copy of the writ to Barry S. Berke, of Gibson Dunn, who is counsel for Tether.

58. On February 2, 2025, the Kims, through counsel, spoke with Berke and his associate Daniel Ketani. Berke and Ketani explained that Tether cooperates with U.S. government requests but would not cooperate with the Kims.

59. Berke and Ketani also indicated that Tether would not agree to accept or waive service of documents in the *Kim* matter.

60. The Kims intend to move for an order directing the Marshal to serve the writ of execution on Tether either via mail or via methods established by the Hague Convention.

61. Under New York law, the Kims established a judicial lien over all property interests of North Korea that Tether is capable of turning over because a writ of execution operates as a judicial lien once it is served on the executing officer, in this case, the Marshal.

62. Specifically, "[u]nder New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the

15

sheriff." *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991); *see also* David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 St. John's L. Rev. 43, 47–50 (2009) (explaining that New York law creates a lien on property as of the moment the judgment creditor delivers an execution to the executing officer).

\* \* \*

63.    For all the reasons stated above, Claimant Han Kim has a legally cognizable interest in, and valid claim to, so much of the Defendant Property as is necessary to fully satisfy the compensatory-damages portion of his judgment. Claimant's right to, title to, and interest in the Defendant Property is superior to any right to, title to, or interest in the Defendant Property held by the United States or by Huobi. Accordingly, Claimant is entitled to so much of the Defendant Property as is necessary to fully satisfy the outstanding amount of the compensatory-damages judgment at the time of payment, in an amount to be determined at the time of payment.

64.    Claimant hereby demands a trial by jury under Rule G(9) of the Supplemental Rules.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com

16

(202) 670-4809

/s/ *Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

/s/ *Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Claimant Han Kim*

17

## Verification

|  |  |
|---|---|
| UNITED STATES, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 25-CV-3943 |
| APPROXIMATELY 13.98 MILLION USDT, | ) JURY TRIAL DEMANDED |
| Defendant in rem, | ) |
| Han Kim, | ) |
| Claimant | ) |

I, Han Kim, declare under penalty of perjury of the laws of the United States of America that the foregoing Verified Claim is true and correct to the best of my knowledge, information, and belief.

Date: February 9, 2026

Signature: _____

18