**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 13.98 MILLION USDT,<br><br>Defendant in rem,<br><br>HAN KIM and YONG SEOK KIM,<br><br>Claimants. | ) | Case No. 25-CV-3943<br><br>JURY TRIAL DEMANDED |

**HAN KIM AND YONG SEOK KIM'S RESPONSE TO THE UNITED STATES'S MOTION TO STRIKE AND FOR PARTIAL JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. FACTS AND PROCEDURAL BACKGROUND ..... 4

A. Background on Blockchain Technology and Tether ..... 4

B. The Kims' Efforts to Recover For the Kidnapping, Torture, And Murder of Their Loved One ..... 5

C. North Korea Obtains Crypto Assets Through Fraud, Launders Them And Commingles Them With Assets From Other Sources, Then Sells Them For USDT ..... 7

D. The Kims Establish an Execution Lien on The Defendant Property ..... 9

E. This Proceeding ..... 10

III. ARGUMENT ..... 11

A. Legal Standard ..... 12

B. The Kims Have Standing Under *Levin II*, Which The Government Ignores ..... 13

C. The Defendant Property Is "Blocked" by IEEPA Because it Is Owned by a Sanctioned Party And it Is "Within the United States," Which The Government Ignores ..... 16

1. The Defendant Property is "blocked" under TRIA ..... 16

2. The mere fact the Government's complaint does not itself try to block the property is irrelevant ..... 18

D. The Court Need Not Address The Government's Attempt to Give The Defendant Property to Huobi on This Motion ..... 20

IV. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## CASES

*Don King Prods., Inc. v. Thomas*, 945 F.2d 529 (2d Cir. 1991) .............................. 9, 13

*Estate of Levin v. Wells Fargo Bank, N.A. ("Levin II")*, 156 F.4th 632 (D.C. Cir. 2025) .............................. passim

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29 (D.D.C. 2013) .............................. 2, 6

*Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) .............................. 6

*Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286 (D.D.C. 2015) .............................. 2, 6

*Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016) .............................. 18

*Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) .............................. 18

*United States v. $17,900 in U.S. Currency*, 859 F.3d 1085 (D.C. Cir. 2017) .............................. 12

*United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d 1 (D.D.C. 2009) .............................. 12, 22

*United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995) .............................. 3, 22

*United States v. BCCI Holdings (Luxembourg)*, 833 F. Supp. 29 (D.D.C. 1993) .............................. 22

*United States v. Emor*, 785 F.3d 671 (D.C. Cir. 2015) .............................. 12, 20

*United States v. Fifty-Three Virtual Currency Accounts*, No. 20-CV-2227, 2025 U.S. Dist. LEXIS 189015 (D.D.C. Sep. 25, 2025) .............................. 19, 20

*United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350 (D.D.C. 2015) .............................. 13

*Van Loon v. U.S. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024) .............................. 7

## STATUTES AND RULES

18 U.S.C. § 981 .............................. 12

18 U.S.C. § 983 ........ 13

18 U.S.C. §§ 1343, 1349, 1956, 1030, and 371 ........ 10

28 U.S.C. § 1605A ........ 17

28 U.S.C. § 1610 ........ 7, 17

28 U.S.C. § 1961 ........ 7

North Korea Sanctions and Policy Enhancement Act of 2016, Pub. L. 114-122 ........ 19

Supplemental Rule G, Supp. Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ........ 11, 12

Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322 ........ 1, 13, 17

**OTHER AUTHORITIES**

31 C.F.R. § 594.201 ........ 17

David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 St. John's L. Rev. 43 (2009) ........ 9

OFAC, SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST (Oct. 2025) ........ 18

## I. INTRODUCTION

The Government moves to strike the filings of Claimants Han and Yeong Seok Kim for lack of standing in this forfeiture action. The Kims hold money judgments against North Korea and execution liens against the property that the government now seeks to forfeit. *See* ECF Nos. 8, 9. In *Estate of Levin v. Wells Fargo Bank, N.A. ("Levin II")*, 156 F.4th 632 (D.C. Cir. 2025), which the Government does not cite, the D.C. Circuit held that execution liens defeat the Government's forfeiture claims as a matter of law because of the Terrorism Risk Insurance Act ("TRIA"). *Levin II* controls and the Government's motion should be denied.

In *Levin II*, the following events happened in the following order: (1) the Government seized property pursuant to a warrant and brought a forfeiture complaint alleging that the property was the proceeds of or involved in crime, including bank fraud and money laundering, *see* Complaint, ECF No. 1, *United States v. $2,340,000 Associated With Petroleum Tanker Nautic*, No. 20-CV-1139 (D.D.C., May 1, 2020); (2) people with terrorism-related judgments against Iran, which the judgment creditors alleged owned the defendant property, served writs of execution on the financial institutions possessing the defendant property, *Levin II*, 156 F.4th at 638; (3) the judgment creditors filed timely verified claims in the forfeiture action, *$2,340,000*, ECF No. 4, 20-CV-1139 (D.D.C., June 30, 2020); and (4) the Government sought to forfeit the property over the judgment creditors' objections, *Levin II*, 156 F.4th at 638. The D.C. Circuit ruled that the government could not do so, *id.*, holding that the defendant property was "blocked" under the International Emergency Economic Powers Act because it was property of a state sponsor of terrorism, and,

therefore, that the judgment creditors' liens from terrorism-related judgments defeat the Government's claim to forfeiture because the TRIA "subject[]s to execution" the blocked assets of a terrorist party "notwithstanding any other provision of law." *Levin II*, 156 F.4th at 638.

The same events that happened in *Levin II* happened here, in the same order. Here, the Government seeks to forfeit the interests of the Democratic People's Republic of Korea ("North Korea") or its agencies or instrumentalities in a digital ledger balance of approximately 13.98 million Tether (USDT) that the United States alleges North Korea obtained by selling other crypto assets North Korea had taken by fraud from Claimant Huobi Global *S.A.*, a Panamanian crypto exchange, and that the United States seized by warrant. ECF No. 1, Complaint ¶¶ 13, 31–34. Claimants Han Kim and Yong Seok Kim, whose loved one was murdered by North Korea in an act of terrorism, *Kim v. Democratic People's Republic of Korea ("North Korea")*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015), obtained a lien on North Korea's property interests with Tether International *S.A. de C.V.* (the company that issues USDT) by serving that company with writs of execution. ECF Nos. 8–9, ¶¶ 52–56. The Kims then filed verified claims, a combined Answer, ECF No. 22, and a motion for judgment on the pleadings, ECF No. 23, which the Government moves to strike so that it can forfeit the property, ECF No. 25. The Kims are identically situated to the judgment creditors in *Levin II* and have standing.

The Government's motion is a non sequitur. It argues that the Kims are not "innocent owners" under the forfeiture statute and, therefore, cannot possibly have

standing. ECF No. 25-1 at 3–15. The Government is right that the Kims do not assert an innocent-owner defense. But the Government is wrong that this means that the Kims lack standing. *Levin II* binds this Court and holds that the Kims' claims *defeat* the Government's claim for forfeiture, ECF No. 23, which easily establishes standing.

Along the way, the Government's brief makes another major mistake. Although Huobi's claim is not relevant to the Government's motion, the Government nonetheless appears to be trying to direct the Defendant Property to Huobi, whose owner evidently has the ear of the Administration. *See* Angus Berwick, *et al.*, *A Crypto Billionaire Who Feared Arrest in The U.S. Returns for Dinner With Trump*, WALL STREET JOURNAL, May 22, 2025. The Government argues that "claimant Huobi was the first party owner *of the defendant property* at the time of the theft." ECF No. 25-1 at 4 (emphasis added). This statement is false: according to both the Complaint and Huobi's admissions, the Defendant Property in this case is *not* the stolen property but is in fact a USDT balance that North Korea obtained as a result of hundreds of exchanges of fungible property. ECF No. 1 ¶ 12. And, under binding D.C. Circuit law, that means Huobi is not entitled to the Defendant Property as a substitute for its loss. *See United States v. BCCI Holdings (Lux.), S.A*, 6 F.3d 1185, 1191 (D.C. Cir. 1995). The Government inexplicably ignores this holding.

Accordingly, this Court should deny the Government's motion to strike and for partial judgment on the pleadings. This Court should order the Government and Huobi to respond to the Kims' pending motion for judgment on the pleadings, ECF No. 23, and should do so expeditiously, as explained in the Kims' simultaneously filed

request to expedite. And, with those issues settled, the Court should issue judgment in favor of the Kims and order that the Defendant Property be transferred to them.

## II. FACTS AND PROCEDURAL BACKGROUND

The following facts in subsections A through D are taken from the Kims' motion for judgment on the pleadings and repeated here for the Court's convenience. All facts are taken from the pleadings in this case or from existing judgments or other proceedings. Because the three claimants admit the relevant facts of the Complaint, this Memorandum cites the Complaint only for the facts that appear there.

### A. Background on Blockchain Technology and Tether

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. ¶ 23. The blockchain at issue in this case is called Tron. *E.g.*, ¶ 32. Users participate in Tron using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. ¶ 20. Each time Tron validates a new block, it updates the state of its ledger to reflect information about each wallet address on the blockchain. ¶ 23. Tron can record transactions in many different assets. ¶ 17. This standard enables anyone on the Tron blockchain to create a "token" using something called a "smart contract" under the TRC-20 standard. ¶ 25. A TRC-20 token is represented by a number representing a token balance associated with a wallet address that holds that balance. ¶ 23.

All standard tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. But some TRC-20 tokens have additional functions encoded by their

creators, including, for example, the ability for the creator to freeze the token balance of specific wallets so that they will always remain the same; to decrease the token balances of wallets; and to increase the token balances of wallets. ¶ 19.

A company called Tether issues a crypto asset called USDT. ¶ 19. To issue USDT, Tether uses its private keys to direct the smart contract code that it controls to cause a wallet address's USDT balance to equal the amount of USDT purchased. ¶ 19. Then, anyone with the private keys to *that* wallet address can transfer the USDT to any other wallet address. ¶ 21. Tether always retains the power to cause the USDT balance of any wallet address to remain frozen or to decrease to zero. ¶ 19. At any time, then, anyone who possesses one of *two* private keys can cause the USDT balance of a wallet address to decrease while simultaneously causing the USDT balance of another wallet address to increase: the person who holds the private keys to the decreasing (or sending) wallet address can do so, and Tether also always has this power as well because it holds the private keys to Tether's smart contract code. *See* ¶¶ 19, 21.

### B. The Kims' Efforts to Recover For the Kidnapping, Torture, And Murder of Their Loved One

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. Democratic*

*People's Republic of Korea,* 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51.

In 2009, the Kim family sued North Korea for the abduction and murder of Reverend Kim. *Kim v. Democratic People's Republic of Korea*, No. 09-CV-648, Dkt. 1 (D.D.C. April 8, 2009). North Korea, after being properly served, did not appear to defend. *Id.* Dkt. No. 12 (entry of default). And so the Kims sought a default judgment. *Id.* Dkt. No. 46. The district court denied that request, reasoning that Kims had not presented evidence sufficient to meet the Foreign Sovereign Immunity Act's special provision for proof when a defendant defaults. *Kim*, 950 F. Supp. 2d at 34. The Kims appealed and the D.C. Circuit reversed, holding that "[t]he Kims . . . make a compelling case that North Korea" tortured Reverend Kim and murdered him outside of the normal legal process. 774 F.3d at 1050. On remand, the district court entered a default money judgment of $15,000,000 in compensatory damages for each of the Kims and $300,000,000 in punitive damages to be divided between them. *Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015). The Kims served the default judgment on North Korea, and on July 23, 2019, the court granted the Kims permission to enforce the judgment under 28 U.S.C. § 1610(c). Since judgment issued,

Claimant's compensatory damage award has accrued approximately $411,796 of interest pursuant to 28 U.S.C. § 1961.

### C. North Korea Obtains Crypto Assets Through Fraud, Launders Them And Commingles Them With Assets From Other Sources, Then Sells Them For USDT

North Korea conducts widespread and extremely aggressive campaigns of cyber-attacks. ¶ 15. On November 22, 2023, North Korean agents wrongfully acquired assets worth approximately $107 million at the time from Huobi. ¶ 31. North Korean agents did this by tricking a Huobi engineer to download and run a malicious program that gave North Korea access to the Huobi engineer's computer. ¶ 32.a. That computer then connected to a server hosting malicious programs called "malware," ¶ 32.b, which the agent then used to access Huobi's internal network and steal its crypto assets, ¶ 32.d.

Shortly after the theft, North Korean agents traded some of the stolen assets for the native asset of the Ethereum blockchain, called ETH, ultimately consolidating 47,194 ETH in newly created Ethereum wallet addresses. ¶ 34. (For relevant purposes, Ethereum and Tron function identically.) The 47,194 ETH remained in those newly created wallet addresses until March 13, 2024, when North Korean agents sent them to a service called Tornado Cash, which is a service called a "crypto mixer" that obscures the origins of crypto transactions by blending assets with other users' assets. ¶ 35. (For more details on Tornado Cash, see *Van Loon v. U.S. Dep't of the Treasury*, 122 F.4th 549, 557–58 (5th Cir. 2024).) Next, when North Korean agents withdrew assets from Tornado Cash, they "commingled [those assets] with other funds known to have been stolen by the APT38 actors." ¶ 42. For this reason,

the Complaint alleged—and the parties do not dispute—that the assets coming out of Tornado Cash were withdrawn by North Korea. *Id.*

North Korean agents then took the ETH from Tornado Cash and exchanged it, via a service called ThorSwap, for Bitcoin at the then-prevailing market price for that exchange. ¶ 35. Over the next few days, North Korean agents made a dizzying series of Bitcoin transactions between wallet addresses that they controlled. ¶ 37. In or around April of 2024, North Korean agents sent some of the Bitcoin to a service called Bitget, which maintains accounts for its users and holds Bitcoin on their behalf. ¶ 38.c. North Korean agents then sold some of that Bitcoin for USDT using a service called Binance BNB Smart Chain. ¶ 54. Eventually, the USDT balances that North Korea received in exchange for its Bitcoin ended up (after many other exchanges and obscuring transactions, ¶¶ 58–71) in the Target Addresses, which are 47 Tron blockchain addresses defined by the Complaint. ¶ 13.

On April 9, 2024, based on a tip from Binance, the FBI requested that Tether voluntarily freeze the USDT balances of the Target Addresses. ¶ 58. On or about March 19, 2025—nearly a year later—the FBI provided Tether with a copy of seizure warrant 25-sz-33. ¶ 72. Accordingly, on or around March 19, 2025, Tether caused the USDT balance of the target wallet addresses to equal zero and the USDT balance of a wallet address belonging to the United States to equal the USDT balances that the target wallet addresses had before Tether decreased them to zero. The United States describes the March 19, 2025, transaction as "Tether then transferred to the United

States the equivalent amount of USDT as was associated with the Target Addresses." ¶ 72.

### D. The Kims Establish an Execution Lien on The Defendant Property

In 2025, the Kims registered their judgment against North Korea in the United States District Court for the Southern District of New York, *Kim v. Democratic People's Republic of Korea*, No. 25-MC-527 (S.D.N.Y. 2025). On December 10, 2025, the Clerk of the United States District Court for the Southern District of New York issued writs of execution in *Kim v. DPRK*, 25-CV-527. That day, the Kims, through counsel, personally served those writs on the United States Marshal for the Southern District of New York. ECF No. 8–9, ¶ 53. One of the writs "respectfully request[ed] that [the Marshal] execute this judgment by garnishing DPRK's assets, funds, or interests in the possession of Tether International, *S.A. de C.V.*" *Id.* ¶ 56. The writ specifically requested that the Marshal

> [L]evy or seize all assets, funds, and property interests of any kind of the Democratic People's Republic of Korea or its agencies or instrumentalities, including but not limited to Tether Coins ("USDT"), digital wallet balances, any interest in Tether International S.A. de C.V., or its affiliates' cash, securities, or bonds, or other obligations and any other assets or interests held by, or for the benefit of, the Democratic People's Republic of Korea and its instrumentalities and agents.

*Id.* Under New York law, the service of this writ on the marshal created an execution lien in the Kims' favor. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991); *see also* David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 ST. JOHN'S L. REV. 43, 47–50 (2009) (explaining that New York

law creates a lien on property as of the moment the judgment creditor delivers an execution to the executing officer).

### E. This Proceeding

The Government filed the Complaint in this case on November 14, 2025, alleging that the Defendant Property, which is the "reissued USDT" that had previously been associated with the Target Addresses, ¶ 12, "is property constituting or derived from proceeds traceable to wire fraud, wire fraud conspiracy, money laundering, money laundering conspiracy, computer fraud and computer fraud conspiracy in violation of 18 U.S.C. §§ 1343, 1349, 1956, 1030, and 371." ¶ 75.

Claimant Huobi Global, *S.A.* is a "corporation organized and existing under the laws of the Republic of Panama" that "owns and operates HTX, a global virtual currency exchange, and is the developer of the Huobi ECO Chain," known as the HECO Bridge. ECF No. 7 ¶ 2. It filed a five-paragraph verified claim on February 2, 2026. *Id.* Huobi's claim does not contend that the Defendant Property was ever in its possession, nor even that North Korea stole *any* USDT from HTX or the HECO Bridge. Instead, Huobi contends that North Korea "stole virtual currency valued at over $107 million from HTX and the HECO Bridge, and laundered a portion of those assets through various platforms and blockchain services," *id.* ¶ 2, and that the USDT at issue here are "traceable proceeds of the HTX and HECO Bridge theft," *id.* ¶ 3.

Huobi and the Government were apparently in discussions about the apparently uncontested forfeiture of the Defendant Property to the Government and presumptive remittance of the funds to Huobi. On February 19, 2026, they jointly filed a stipulation to dispense with the filing of Huobi's Answer because the

Government and Huobi were "in the process of discussing resolution of the foregoing claim." ECF No. 13 at 1. On February 23, 2026, Huobi answered, *see* ECF No. 17, and on February 24, 2026, this Court rejected that stipulation in any event, *see* Minute Order of Feb. 24, 2026.

The Kim Claimants filed their separate, verified claims on February 9, 2026. *See* ECF Nos. 8, 9. As explained, their claim to the Defendant Property is based on the fact that they had previously created a lien on Tether that gives them the right to any interests in USDT that is held by North Korea. ECF No. 8–9, ¶¶ 53–56. As the D.C. Circuit held in *Levin II*, that entitles the Kims to the property as a matter of law. Accordingly, on February 27, 2026, the Kims filed a motion for judgment on the pleadings. ECF No. 23.

The Government has not responded to that pending motion. Instead, the Government has filed the instant motion to strike the Kims' claims (and for partial judgment), ECF No. 25, which has the effect of delaying the Government's response to the Kims' motion for judgment because a motion to strike "must be decided before any motion by the claimant to dismiss the action," Supplemental Rule G(8)(c).

Because the Defendant Property's value erodes each day, and because the Government's filing is so plainly wrong, the Kims have separately moved for expedited consideration of this Motion so that the case can move forward.

## III. ARGUMENT

The Government's brief makes a simple category error. The Government contends that the Kims' claims must be struck because they are not innocent owners within the meaning of 18 U.S.C. § 981(f), the statute governing civil forfeitures. But

that is not the only statute governing here. In 2016, Congress passed the TRIA, under which the Kims straightforwardly win this case, as the D.C. Circuit held in *Levin II*. To the extent the Court wishes to address the Government's irrelevant asides in support of Huobi (which the Court need not do), they fail as well.

### A. Legal Standard

In a forfeiture action brought *in rem* pursuant to a federal statute, the United States "may move to strike a claim or answer" at "any time before trial." Supplemental Rule G(c)(1). A motion to strike a party's claim and answer "may be presented as a motion for judgment on the pleadings." Supplemental Rule G(8)(c)(ii)(B). To defeat a motion to strike, claimants must show that they have constitutional and statutory standing to contest the government's forfeiture. "[T]he requirements for a claimant to demonstrate constitutional standing to challenge a forfeiture are very forgiving." *United States v. $17,900 in U.S. Currency*, 859 F.3d 1085, 1089 (D.C. Cir. 2017) (citing *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015)) (alterations omitted); *see also United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d at 6 ("[I]n a civil forfeiture case, a claimant's constitutional standing turns upon whether the claimant has a sufficient interest in the property to create a case or controversy.") (citations omitted). "In general, any colorable claim on the property suffices, if the claim of injury is 'redressable, at least in part, by a return of the property.'" *Emor*, 785 F.3d at 676 (emphasis added) (internal citations omitted).

In the mine run of forfeiture cases, statutory standing is shown by contending that the claimant qualifies as an "innocent owner" under 18 U.S.C. § 983(d)(2). *E.g.*, *United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350, 355 (D.D.C. 2015)

(explaining innocent-owner defense under Section 983). But here the Kims show statutory standing under the TRIA, which operates to defeat the forfeiture statute's limitations because the Terrorism Risk Insurance Act "subject[]s to execution" the blocked assets of a terrorist party "notwithstanding any other provision of law." *Levin II*, 156 F.4th at 638.

### B. The Kims Have Standing Under *Levin II*, Which The Government Ignores

At the risk of repetition, this case is squarely controlled by *Levin II*. In *Levin II*, the Court held that because "blocked" property covered by TRIA "shall be subject to execution" of judgments covered by TRIA "notwithstanding any other provision of law," judgment creditors holding covered judgments who execute on blocked property that is also the subject of a forfeiture action prevail. *Id.* The Kims have executed on the Defendant Property by serving a writ of execution on the U.S. Marshal directed to its issuer, which, under applicable New York law, created an enforceable lien on the Defendant Property. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991). And the Defendant Property is "blocked" under IEEPA. *See infra* Section III.C.

The Government does not contest any of this. ECF No. 25-1. Instead, the Government first argues that the Kims lose automatically because they cannot state an innocent owner defense under Section 983 because the Government's title to the Defendant Property relates back to the time of the original crime, at which time the Kims did not have a lien on the property. *Id.* at 3–5. The Government may be right that if this were an ordinary forfeiture case the Kims' lien would have come "too late," *id.* at 12, and the Government may be right that the Kims cannot qualify as bona fide

purchasers for value because they did not purchase the Defendant Property, *id.* at 11. But this case is governed by the TRIA, which was passed after the Civil Asset Forfeiture Reform Act, and which operates to supersede the government's forfeiture case here even where the writ of execution is served after the seizure of the defendant property. After all, that is exactly what happened in *Levin II*. 156 F.4th at 636.

Unable to contest that *Levin II* controls here, the Government asserts, without support, that because a "third party's claim is to be measured not as it might appear at the time of the litigation, but rather as it existed at the time of the [*sic*] illegal acts were committed," the "potential claimants' assertion that they are lien judgment general creditors is incorrect" because "they did not perfect their lien until after the time of the beginning of the crime giving rise to forfeiture." ECF No. 25-1 at 7 (citation omitted). But that is exactly what happened in *Levin II*, where the claimants won. 156 F.4th at 636. Importantly, the Government does not—because it cannot—contest that the Kims indeed "perfect[ed] their lien," instead contending that this happened "after the time of the beginning of the crime giving rise to forfeiture." ECF No. 25-1 at 7. Correct. And so the Kims win. 156 F.4th at 636.

Next, the Government describes the Kims' lien as "a generic lien," which the Government contends renders the Kims "general" "unsecured" creditors of North Korea, who lack standing accordingly. ECF No. 25-1 at 9. It is hard to know what the Government means by this, because "generic lien" is not a legal category under New York law, which the Government concedes governs the Kims' writ of execution. Perhaps the Government means that because the Kims have a lien on *all* North

Korea's property interests with Tether, not just the specific balance that constitutes the Defendant Property here, the Kims lien is somehow no good. But, again, that is what happened in *Levin II* as well: There, the claimants served writs of execution on Wells Fargo directed to all assets of the judgment debtors, not just those that the claimants knew Wells Fargo to possess. *E.g.*, *Levin v. Islamic Republic of Iran*, ECF No. 12, No. 20-MC-0035-KES (D.S.D., Dec. 31, 2020). Sure, the claimants in *Levin II* knew of specific assets at Wells Fargo, *id.* ECF No. 3 (seeking writ of execution based on presence of specific assets), but so did the Kims, *see Kim v. Democratic People's Republic of Korea*, ECF No. 13-1, No. 25-MC-527 (S.D.N.Y., Feb. 20, 2026) ("Tether has frozen the USDT balances of at least 75 wallet addresses that have some known links to North Korea."). And anyway, there is no indication from the Government in any source of law that anything about this category of facts is relevant.

The Government, finding no law applicable law or relevant facts with which to contest the Kims' claims, turns to its feelings. The Government complains that it did a lot of work to trace the crypto assets in this case, ECF No. 25-1 at 13, and, therefore, that "[c]omparing [the Government and Huobi] with the potential claimants, who rise out of *in personam* claim [*sic*] with a default judgment, generates a palpable feel that the potential claimants are out of place, undertaking no effort to trace, and cutting in rather abruptly . . . ." *id.* Be that as it may, the Government's feelings—palpable or otherwise—are irrelevant here. The Kims timely perfected a lien over the Defendant Property and timely—indeed "abruptly"—filed verified claims. Their claims to the Defendant Property are superior to the Government's, let alone colorable, and so the

Government's motion should be denied. And, what's more, the Government's "feel[ings]" are misplaced. The Government's job is to enforce the laws that were enacted by and to benefit its citizens, not to play favorites. Congress, for good reason, prioritized the claims of American victims of terrorism, and so the Kims, who are American victims of terrorism, should recover here. The Government should "feel" happy about that.

### C. The Defendant Property Is "Blocked" by IEEPA Because it Is Owned by a Sanctioned Party And it Is "Within the United States," Which The Government Ignores

The Government next argues, in two short paragraphs, that the Defendant Property is not "blocked" because the Government did not use *this action* to block it. First, the Kims explain that the property is indeed blocked. (This subsection is taken from their motion for judgment on the pleadings and reproduced here for the Court's convenience.) Then the Kims explain that the Government's argument is meritless because there is no requirement that the forfeiture action itself effect a blocking.

#### *1. The Defendant Property is "blocked" under TRIA*

Under D.C. Circuit law, a lien to execute a terrorism-related judgment against the blocked assets of a state sponsor of terrorism prevails over the government's forfeiture claims to the same assets because of the TRIA. *Levin II*, 156 F.4th at 638. Here, the Defendant Property are blocked assets of a terrorist party and the Kims' judgment is for an act of terrorism, and so the Kims' execution lien takes priority over the Government's forfeiture.

Section 201 of the TRIA provides in relevant part that

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* (quoting Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322). The "TRIA defines a 'blocked asset' as 'any asset seized or frozen by the United States' under IEEPA, but it excludes from the definition assets that are subject to certain licenses or used exclusively for diplomatic purposes." *Id.* (quoting TRIA § 201(d)(2)(A)–(B)). The TRIA "defines a 'terrorist party' to include any foreign country designated as a state sponsor of terrorism. *Id.* (quoting TRIA § 201(d)(4)). And a terrorism-related judgment includes "any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section . . . 28 U.S.C. § 1605A." 28 U.S.C. § 1610. The USDT at issue meets this definition.

The Defendant Property are "the blocked assets" of a terrorist party because "when property of designated persons comes 'within the United States' or 'the possession or control of U.S. persons,' it is 'blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in.'" *Levin II*, 156 F.4th at 638 (quoting 31 C.F.R. § 594.201(a)). Here, the Defendant Property is currently owned by North Korea or its agencies or instrumentalities. *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930 (6th Cir. 2000) ("[I]f a thief steals funds and uses them to purchase other property the owner cannot follow the funds, and he is left to his remedy against the

thief, who, although he had no title to the stolen funds, *does have title to the property purchased therewith*.") (emphasis added). North Korea (and its agencies and instrumentalities, such as the "Lazarus Group" or "APT-38") are "designated persons" under IEEPA. *See, e.g.*, OFFICE OF FOREIGN ASSET CONTROL (OFAC), SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST at 1452 (Oct. 2025). And the property is both "within the United States" and in "the possession or control of [a] U.S. person." ECF No. 1 ¶ 73 ("The Defendant Property is currently in the possession of the USMS."); *see also Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016) ("[A]ll assets belonging to an entity that satisfies [the] definition of [a terrorist party under an executive order] are automatically blocked."). It is therefore "frozen" by IEEPA and constitutes "blocked" property under TRIA.

*2. The mere fact the Government's complaint does not itself try to block the property is irrelevant*

The Government does not contest that the Defendant Property meets the statutory definition of "blocked" property. Instead, the Government first argues that because "[t]he United States acted pursuant to the asset forfeiture laws and the potential claimants themselves admit it," this "tautologically establishes that they lack standing and it is impossible from this as well for them to establish standing." ECF No. 25-1 at 16.[1] But, as is becoming a theme, this is exactly what happened in

[1] It is hard to know precisely what the Government is trying to say here because this is a puzzling use of the word "tautologically." *See* MERRIAM-WEBSTER, *Tautological* ("[T]rue by virtue of its logical form alone."). Taken literally, the Government appears to be saying that the Kims' admission to the fact that the Government "acted pursuant to the forfeiture laws"—which is, by definition, the only way the Government can initiate a forfeiture proceeding—automatically "establishes

*Levin II*: There, it was not the Government's forfeiture action that caused the property to be blocked, but rather the fact that it met the statutory definition. After all, in *Levin II*, the Government alleged that the defendant property was the proceeds of crime just as it does here. Complaint, ECF No. 1, *United States v. $2,340,000 Associated With Petroleum Tanker Nautic*, No. 20-CV-1139 (D.D.C., May 1, 2020). The fact that one of those crimes was a sanctions violation, *id.*, had no bearing on the Court's decision, *see generally Levin II*, 156 F.4th 632.

Next, the Government contends that "from a statutory scheme perspective, an IEEPA or North Korea Sanctions Act[2] forfeiture, does not provide an innocent owner defense," and "it is well-established and recently reaffirmed that TRIA does not permit avoidance of the forfeiture standing requirements." ECF No. 25-1 at 16 (citing *United States v. Fifty-Three Virtual Currency Accounts*, No. 20-CV-2227 (RC), 2025 U.S. Dist. LEXIS 189015, at *6 (D.D.C. Sep. 25, 2025)). Setting aside that the Government contends that this *is not* an "IEEPA forfeiture," ECF No. 25-1 at 6, these assertions are irrelevant. Neither TRIA nor IEEPA creates an innocent owner defense. *Id.* And these acts do not "permit avoidance of the forfeiture standing" requirements. *Id.* These acts *create statutory standing* because they create interests

---

[the Kims] lack standing" and could *never* achieve standing. That cannot be right, or else no claimant would ever have standing.

[2] The Government gives no citation for this enactment, and there is no federal law with the popular or common name of the North Korea Sanctions Act. *See* U.S. HOUSE OF REPRESENTATIVES, ACTS CITED BY POPULAR NAME (current as of March 18, 2026), https://uscode.house.gov/popularnames/popularnames.pdf. The Government may be referring to the North Korea Sanctions and Policy Enhancement Act of 2016. Pub. L. 114–122. *Id.* at 278.

strong enough to defeat the Government's forfeiture claims outright. *Levin II*, 156 F.4th at 637. At the very least, they create "colorable" interests sufficient to meet the low bar for standing. *Emor*, 785 F.3d at 676.

In *Fifty-Three Virtual Currency Accounts*, on which the Government obliquely relies, Judge Contreras held that claimants who "assert a right to the Defendant Properties based solely *on . . . unsatisfied . . . judgment[s]* . . ." do not have statutory standing despite TRIA. *Fifty-Three Virtual Currency Accounts*, 2025 U.S. Dist. LEXIS 189015, at *11 (emphasis added). But this Court need not consider this question because the Kims have already perfected an *execution lien* on the Defendant Property, just as the claimants in *Levin II* did, and as the Government concedes here.

### D. The Court Need Not Address The Government's Attempt to Give The Defendant Property to Huobi on This Motion

The Kims explain in their motion for judgment on the pleadings that this Court should dismiss the Government's forfeiture claim because it is defeated by the Kims' lien, then retain jurisdiction to dispose of the Defendant Property, and then order that the Defendant Property be given to the Kims because Huobi has no valid claim to it. ECF No. 23. Here, the Government moves to strike the Kims' claims and enter a partial judgment on the pleadings in the Government's favor subject to Huobi's future assertion of an affirmative defense as an innocent owner. ECF No. 25-1 at 17. As explained above, the Government's motion should be denied because the Kims have standing to contest the forfeiture. For present purposes, then, Huobi's claim is irrelevant.

But the Government, which tried unsuccessfully to relieve Huobi from the obligation even to answer the complaint, let alone to prove its case, ECF No. 14, evidently cannot resist the temptation to explain that it thinks Huobi should receive the Defendant Property in this case. To the extent the Court considers the Government's asides, the Court should reject them.

The Government, to support its claim that a "victim-owner from whom specific property is criminally taken without consent by way of theft, embezzlement, or robbery" is "the only possible claimant with standing as a statutory innocent owner," makes at least three mistakes.

First, the Government contends that Huobi "was the first party owner *of the defendant property* at the time of the theft." ECF No. 25-1 at 4 (emphasis added). False. As the Complaint explains, and Huobi itself admits, the Defendant Property in this case is a USDT balance that North Korea obtained as a result of hundreds of exchanges of fungible property. ECF No. 1 ¶ 12; ECF No. 17 ¶ 12. There is no allegation that the USDT balance constituting the Defendant Property was ever stolen from Huobi; indeed, there is no allegation that *any* USDT was stolen from Huobi at all. It is as if the stolen property were U.S. Dollars and the Government forfeited Euros, or a car, purchased with those dollars and still asserted that Defendant Property was *identical* to the stolen property. That is not the law. *United States v. Emor*, 785 F.3d 671, 679 (D.C. Cir. 2015); *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930 (6th Cir. 2000) ("[I]f a thief steals funds and uses them to purchase other property the owner cannot follow the funds, and he is left to his remedy against

the thief, who, although he had no title to the stolen funds, *does have title to the property purchased therewith*." (emphasis added) (citations omitted)). Unsurprisingly, the Government's contention that the Defendant Property is the *same property* stolen from Huobi comes with no citation.

Second, the Government argues that the district court opinion in *United States v. BCCI Holdings (Luxembourg)*, "h[eld] that the victim-owner of an embezzlement may assert a claim only if it can trace its property to the forfeited funds and striking [*sic*] a claim if not [*sic*]." ECF No. 25-1 at 9 (citing 833 F. Supp. 29, 31–32 (D.D.C. 1993)). The district court in *BCCI Holdings* in fact did not hold that claimants who can trace their property to the defendant property "may assert a claim," 833 F. Supp. at 32, but regardless the controlling *D.C. Circuit* opinion in *BCCI Holdings* held that *even where* a claimant *can* trace its embezzled property to the defendant property in a forfeiture case, it *still* cannot assert a sufficient interest to that property, *United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185, 1191 (1995).

Third, the Government, in citing *United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d 1 (D.D.C. 2009) (cited at ECF No. 25-1 at 8), evidently forgot that its own complaint alleges that Huobi was *defrauded*, ECF No. 1 ¶ 3; *8 Gilcrease Lane* held that "[f]raud victims who voluntarily transfer their property to their wrongdoers do not retain a legal interest in their property; instead, such victims acquire a debt against their wrongdoers . . . [and so] *lack* statutory standing to submit any claim . . . ." 641 F. Supp. 2d at 5 (emphasis added).

## IV. CONCLUSION

For the foregoing reasons, this Court should deny the Government's motion

to strike and for partial judgment on the pleadings and order the Government and Huobi expeditiously to respond to the Kims' motion for judgment on the pleadings, which the Court should then grant.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Claimants Han Kim and Yong Seok Kim*